## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY<br>1411 K Street NW, Suite 1300<br>Washington, DC 20005,<br><br>     Plaintiff,<br><br>     v.<br><br>DOUGLAS BURGUM, in his official<br>capacity as Secretary of the U.S. Department<br>of the Interior,<br>1849 C Street NW<br>Washington, DC 20240,<br><br>PAUL SOUZA, in his official capacity as<br>Regional Director of U.S. Fish and Wildlife<br>Service, exercising the delegated authority of<br>the Director of the U.S Fish and Wildlife<br>Service,<br>1849 C Street NW, Room 3345<br>Washington, DC 20240,<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street NW, Room 3331<br>Washington, DC 20240,<br><br>     Defendants. | Case No. 1-25-cv-1168 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. Plaintiff Center for Biological Diversity ("the Center" or "Plaintiff") challenges the unlawful decision of Douglas Burgum, Secretary of the U.S. Department of the Interior (in his official capacity), Paul Souza, Regional Director exercising the delegated authority of the Director of the U.S. Fish and Wildlife Service in his official capacity, and the U.S. Fish and Wildlife Service's ("the Service") (collectively "Defendants") to deny listing protections under the

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, to the brook floater mussel (*Alasmidonta varicosa*). *See* Endangered and Threatened Wildlife and Plants; 12-Month Findings on Petitions to List Eight Species as Endangered or Threatened Species, 84 Fed. Reg. 41,694 (Aug. 15, 2019) ("not warranted" finding).

2.      The brook floater mussel is a small, strictly riverine species of mussel native to the Atlantic slope.

3.      Prior to 1997, the brook floater mussel was broadly distributed in rivers and streams on the east coast of North America, from Canada to Georgia.

4.      Since 1997, the brook floater mussel has been entirely extirpated (i.e., rendered extinct locally while continuing to exist in other settings) in two states (Rhode Island and Delaware) along with the District of Columbia. Additionally, populations in approximately seventy to ninety of the 150 or more known historical sites home to brook floater mussels have been extirpated.

5.      Extant populations of brook floater mussels face threats in every state in which they exist. At the time of the Service's listing decision, eight states (Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New Jersey, North Carolina, and Virginia) listed the brook floater mussel as endangered, two (Georgia and Pennsylvania) listed the mussel as imperiled or critically imperiled, and three (Maine, New York, and Vermont) listed it as threatened.

6.      Habitat fragmentation and destruction, changes in water flows, climate change, dams, invasive species, and other threats associated with human activity have caused the decline and extirpation of brook floater mussel populations.

7.      Many of the remaining populations of brook floater mussels are small and isolated, making them more vulnerable to extinction.

8.     On April 20, 2010, the Center petitioned the Secretary of the Interior (the "Secretary") to have the Service list the brook floater mussel as either threatened or endangered under the ESA.

9.     On September 27, 2011, the Service issued a ninety-day finding for the brook floater mussel that determined that the petition presented substantial scientific information indicating that listing may be warranted. 76 Fed. Reg. 59,836 (Sept. 27, 2011).

10.     Despite its findings in the Final Species Status Assessment Report ("SSA") and the Species Assessment and Listing Priority Assignment Form ("SAF") showing that the brook floater mussel has experienced substantial population decline and will continue to meaningfully decline within the next thirty years, on August 15, 2019, the Service denied the brook floater mussel protection under the ESA as threatened or endangered. 84 Fed. Reg. 41,694, 41,696 (Aug. 15, 2019); *see generally* U.S. Fish and Wildlife Serv., *Species Status Assessment Report for the Brook Floater (*Alasmidonta varicosa*)*, Version 1.1.1. (July 2018) [hereinafter SSA]; U.S. Fish and Wildlife Serv., *Species Assessment and Listing Priority Assignment Form* (Nov. 8, 2018) (for the brook floater, *Alasmidonta varicosa*) [hereinafter SAF].

11.     Plaintiff brings this action against Defendants to remedy the Service's violations of the ESA, 16 U.S.C. §§ 1531 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Specifically, Plaintiff challenges as arbitrary and capricious the Service's determination that listing the brook floater mussel as endangered or threatened under the ESA is not warranted.

12.     Plaintiff requests that this Court declare that the Service has violated the ESA and the APA. Plaintiff also seeks an order vacating and remanding the Service's "not warranted" decision and providing a timeline for a new listing determination for the brook floater mussel that

applies the proper legal standards. Such relief is necessary to afford the mussel the full protections of the law, to which it is entitled and needs to survive, recover, and otherwise avoid extinction in all or in significant portions of its range.

## JURISDICTION AND VENUE

13.     This action arises under the ESA, 16 U.S.C. §§ 1531 *et seq*., and the APA, 5 U.S.C. §§ 551, 701 *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States as defendant); 28 U.S.C. §§ 2201–2202 (declaratory judgments and further relief); 16 U.S.C. § 1540(c) (district court jurisdiction) and (g)(1)(C) (action arising under ESA citizen-suit provision); and 5 U.S.C. §§ 702, 704 (Administrative Procedure Act).

14.     As required by the ESA citizen-suit provision, 16 U.S.C. § 1540(g)(2)(C), the Plaintiff provided the Defendants with written notice of their intent to sue for ESA violations on January 6, 2025, more than sixty days prior to the filing of this complaint. *See* Ex. 1 "Center for Biological Diversity's Sixty-Day Notice of Intent to Sue for Violation of the Endangered Species Act Concerning Denial of Protection for the Brook Floater (*Alasmidonta varicose*)"; Ex. 2 "Proof of Mailing and Delivery of Sixty-Day Notice of Intent to Sue."

15.     Because the Defendants have not remedied their violations of law, there exists an actual controversy between the parties within the meaning of the Declaratory Judgment Act. 28 U.S.C. § 2201.

16.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because this civil action is brought against agencies of the United States and against officers and employees of the United States acting in their official capacities under the

color of legal authority and because a substantial part of the events giving rise to the claims occurred in the District of Columbia. Plaintiff also maintains an office in this judicial district.

## PARTIES

17.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national non-profit conservation organization with more than 93,000 members and with offices in several states, including Tucson, Arizona; Oakland, California; Denver, Colorado; and Portland, Oregon; as well as in Washington, D.C. The Center is dedicated to preserving, protecting, and restoring biodiversity, and it works through science, law, and creative media to secure a future for all species hovering on the brink of extinction.

18.    Plaintiff brings this action on its own behalf and on behalf of its adversely affected members who derive ecological, recreational, aesthetic, spiritual, educational, scientific, professional, and other benefits from the brook floater mussel and the habitat upon which the mussel relies for its continued existence.

19.    Plaintiff and its members are deeply interested in and committed to the conservation of imperiled species, including the brook floater mussel, and have an interest in the effective implementation of the ESA to protect these species.

20.    Plaintiff and its members have researched, studied, and observed or attempted to observe the brook floater mussel and intend to continue to do so in the future. Plaintiff and its members also spend time in the mussel's habitat; Plaintiff's members live in the range of the brook floater mussel and have specific intentions to continue to use and enjoy the brook floater mussel's habitat on an ongoing basis in the future. Plaintiff's members have concrete plans to visit the brook floater mussel's habitat to look for, observe, and study the brook floater mussel.

21.     For example, Center employee and member Tierra Curry has looked for the brook floater mussel in habitats in the North Fork Shenandoah River and South Fork Shenandoah River in Virginia; the South Branch of the Potomac River in West Virginia; the Potomac River in Maryland; the Cacapon River and Lost River in West Virginia; and the Savannah River in South Carolina. Ms. Curry has specific plans to visit the Santee River and Upper Pee Dee River watersheds in North Carolina in 2025 to look for the brook floater mussel in her personal capacity.

22.     Ms. Curry is a deeply concerned conservationist with a long track record of advocacy on behalf of freshwater wildlife and mussels in particular. Ms. Curry regularly attends the Freshwater Mollusk Conservation Society conferences and works to produce media that educates the public on the vital ecosystem role of freshwater mussels.

23.     As a biologist, naturalist, writer, photographer, and person who enjoys spending time recreating in freshwater habitats, Ms. Curry is harmed when her opportunities to encounter the brook floater mussel are diminished because of the Service's failure to protect the brook floater mussel under the ESA.

24.     Ms. Curry drafted the brook floater mussel portion of the petition that the Center submitted on April 20, 2010, to the Service to request that the Service list the brook floater mussel, among other species, as threatened or endangered.

25.     Ms. Curry is concerned that without the protection and conservation measures provided by the ESA, the remaining populations of the brook floater mussel will become extinct.

26.     Center employee and member Will Harlan has looked for the brook floater mussel in habitats in the rivers of Southern Appalachia, including the Clinch River, the Chattooga River, and the Watauga River.

27.    Mr. Harlan has specific plans to visit the Chattooga and the Clinch River in August of this year with his wife and two sons to look for brook floater mussels and other species of freshwater mussels in his personal capacity.

28.    Mr. Harlan is deeply concerned about the decline and disappearance of freshwater mussels and brook floater mussels in particular.

29.    Mr. Harlan believes that without the protection and conservation measures provided by the ESA, the remaining populations of brook floater mussels will become extinct.

30.    As a biologist, naturalist, writer, photographer, and person who enjoys spending time in freshwater habitats and looking for freshwater mussels, including the brook floater mussel, Mr. Harlan is harmed when he loses the ability to encounter the brook floater mussel in the wild.

31.    Center member Michelle Graziosi has conducted extensive field research on the brook floater mussel in the West River in southeastern Vermont. She regularly visits rivers in Vermont to search for brook floater mussels every summer.

32.    Ms. Graziosi is deeply concerned about the decline of brook floater mussels. She believes that brook floater mussels contribute to biodiversity and are integral to maintaining the ecological integrity of waterways.

33.    As an environmental scientist, wildlife admirer, and river enthusiast, Ms. Graziosi is harmed by the Service's failure to protect the brook floater mussel. She actively searches for brook floater mussels in the rivers and streams of Vermont. Her plans to encounter the species will be thwarted if it slips into extinction.

34.    Ms. Graziosi believes that ESA protections would help prevent further declines in brook floater mussel populations. She believes that ESA protection would ensure that the species

receives more attention, promoting ecological health and the biodiversity of the river systems that the brook floater mussel inhabits.

35.    Defendant DOUGLAS BURGUM is the Secretary of the Interior. The Secretary is the federal official charged with administering the ESA and listing species as endangered or threatened under the ESA. He is sued in his official capacity.

36.    The Secretary has delegated his obligation to review and make findings on listing petitions under the ESA to Defendant U.S. FISH AND WILDLIFE SERVICE.

37.    Defendant PAUL SOUZA is a Regional Director exercising the delegated authority of the Director of Defendant U.S. FISH AND WILDLIFE SERVICE. He is sued in his official capacity.

## LEGAL BACKGROUND

### The Endangered Species Act

38.    The ESA, 16. U.S.C. §§ 1531 *et seq.*, provides comprehensive protections for both endangered and threatened species.

39.    In passing the ESA, Congress found that different species "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that "other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction." *Id.* § 1531(a)(1)–(2). Accordingly, the purposes of the ESA include "provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] provid[ing] a program for the conservation of such endangered species and threatened species." *Id.* § 1531(b). The plain intent of Congress in enacting the ESA "was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

40.     To this end, the ESA requires the Secretary to protect imperiled species by listing them as either "endangered species" or "threatened species." 16 U.S.C. § 1533(a)(1).

41.     A species is an "endangered species" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is a "threatened species" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

42.     The Service must determine whether any species is endangered or threatened based on the following factors: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1).

43.     If a species meets the definition of threatened or endangered because it is imperiled by any one of or a combination of these five factors, the Secretary must list the species. *Id.* § 1533(a)(1); 50 C.F.R. § 424.11(c). The Secretary must make all listing determinations "solely on the basis of the best scientific and commercial data available . . . ." 16 U.S.C. § 1533(b)(1)(A).

44.     If the Service concludes that a species is endangered or threatened throughout all of its range, the Service must publish a proposed rule to list the species in the Federal Register. *Id.* § 1533.

45.     If the Service determines that the species is neither endangered nor threatened throughout all of its range, the ESA requires the agency to examine whether it is endangered or threatened throughout any *significant portion* of the species' range. *Id.* § 1532(6), (20).

46.     The ESA does not define what constitutes a "significant portion" of a species' range.

47.     In 2014, the Service promulgated a "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened Species.'" 79 Fed. Reg. 37,578 (July 1, 2014) ("SPR Policy"). The SPR Policy provides that "a key part" of the Service's analysis of whether a species is endangered or threatened in a significant portion of its range is "whether the threats are geographically concentrated in some way." *Id.* at 37,586.

48.     The SPR Policy's definition of "significant portion of range" holds that a portion is significant only if, without that portion, the entire species would go extinct or become endangered. *Id.* at 37,609.

49.     However, courts have rejected the SPR Policy's definition of a "significant portion of range," and several subsequent definitions offered by the Service. *See Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 959 (D. Ariz. 2017), *amended in part*, No. CV-14-02506-TUC-RM, 2017 WL 8788052 (D. Ariz. Oct. 25, 2017); *see also Defenders of Wildlife v. U.S. Fish & Wildlife Service*, 584 F. Supp. 3d 812, 828 (N.D. Cal. 2022) (finding that the Service's interpretation of SPR unreasonable when it defined "significant" by reference to whether a portion "contribute[d] meaningfully to resiliency, redundancy, or representation" without providing any threshold for meaningfulness); *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) (invalidating another prior definition of "significant portion of the range" advanced by the Service).

50.     In its assessment of the brook floater mussel, the Service "determine[d] whether the portion does indeed meet both of the SPR standards" by asking whether "(1) the portion is significant and (2) the species is in danger of extinction or likely to become so in the foreseeable future in that portion." SAF at 24.

**The Administrative Procedure Act**

51.    Under the APA, a court must hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

52.    An agency's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### The Brook Floater Mussel and Threats to Its Continued Existence

53.    The brook floater mussel (*Alasmidonta varicosa*) is a small riverine species of freshwater mussel historically native to the eastern United States and Canada.

54.    Brook floater mussels require undamaged riparian buffers, clean water, and minimal anthropogenic impact. While generally most abundant in small rivers, populations of brook floater mussels have been found in small streams and large rivers.

55.    Brook floater mussels are small, rarely exceeding seventy-five millimeters in length, and their external foot is often a vibrant orange color.

56.    The brook floater feeds by pumping water through its apertures to consume algae and bacteria. This process benefits the ecosystem by cleaning the waters that the mussel inhabits. Freshwater mussels, like the brook floater, embed themselves in streambed sediment, stabilizing the surrounding ecosystem. This solidifies streambeds, improving aquatic habitat for fish and other invertebrates.

57.    Brook floater mussel reproduction is highly temperature dependent, and female mussels typically do not release larvae into the water until temperatures reach 57.2º F (14º C).

58.    Following release, larval mussels attach to fish until they reach a juvenile stage, at which point they detach and fall into streambeds.

59.    Brook floater mussels were found historically in the District of Columbia, Connecticut, Delaware, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, and West Virginia, and in two Canadian provinces (New Brunswick and Nova Scotia).

60.    Today, brook floater mussels have been extirpated from two of these states—Rhode Island and Delaware—and from the District of Columbia. Moreover, populations at seventy to ninety of the approximately 150 sites historically home to the mussel have been extirpated.

61.    Extant brook floater mussel populations face continuing threats—at the time of the Service's decision, all but three states with brook floater mussel populations listed them as endangered, threatened, or imperiled. Similarly, Canadian populations are listed as threated or of special concern under Canadian conservation guidelines.

62.    The brook floater mussel is threatened by habitat fragmentation and destruction, changes in water flows, climate change, dams, invasive species, and other threats associated with human activity.

63.    Human-caused stressors, like dams, urbanization, and pollution, threaten Mussel populations by disrupting and altering stream flows, increasing sediment levels, decreasing water quality, and limiting physical habitat. Similarly, pollution from agricultural fields and operations negatively impacts mussel populations by deteriorating water quality.

64.     Global climate change further threatens brook floater mussel populations through rising water temperatures, which negatively impacts several stages of the mussel's lifecycle, and the increasing frequency and severity of destructive hydrological events, which destroy brook floater mussel habitat.

**Listing Petition and Review History**

65.     The Center and other interested parties petitioned the Service to list the brook floater mussel as threatened or endangered on April 20, 2010.

66.     On September 27, 2011, the Service published its ninety-day finding, holding that the petition presented substantial scientific information that listing the brook floater mussel may be warranted. 76 Fed. Reg. 59,836 (Sept. 27, 2011).

67.     In July 2018, nearly seven years after the affirmative ninety-day finding, the Service issued its Species Status Assessment Report, or SSA, for the brook floater mussel.

68.     An SSA, as described by the Service, is a compilation of the best available science regarding a particular species and provides a biological risk assessment to aid decision makers who must make a listing decision about that species. The SSA evaluates the species' current population status and future viability in the context of its biology and threats to its survival. An SSA does not recommend whether a species warrants listing.

69.     In the brook floater mussel SSA, the Service defined "viability" as the mussel's ability to sustain healthy populations in natural river systems within a biologically meaningful timeframe.

70.     The SSA projects two scenarios for the brook floater mussel during the next thirty years. Both scenarios predicted meaningful population declines.

71.     Following the SSA, the Service prepared a Species Assessment and Listing Priority Assignment Form for the brook floater mussel, which the Service purportedly based on the science contained in the SSA.

72.     The SAF concluded that the brook floater mussel does not warrant listing as a threatened or endangered species.

73.     On August 15, 2019—almost eight years after the initial ninety-day finding—the Service published its "12-month" finding on the brook floater mussel. Therein, despite the clear projections of population decline in the SSA, the Service decided that listing the brook floater mussel as threatened or endangered was unwarranted. 84 Fed. Reg. 41,694, 41,696.

### The Service's Unlawful "Not Warranted" Finding

74.     The Service's 12-month finding denies listing protections to the brook floater mussel by applying an unlawfully stringent standard that allows for listing only if a species is endangered throughout *all* of its range, when listing is also required if a species is imperiled throughout a *significant portion* of its range. 16 U.S.C. § 1532(6), (20). Although brook floater mussel populations have already dramatically declined and are now considered extirpated in seventy to ninety of its approximately 150 historically known sites, leading to complete extirpation in Delaware, Rhode Island, and in the District of Columbia, the 12-month finding nonetheless determined that listing is not warranted because the species is not endangered or likely to become so throughout all or a significant portion of its range. 84 Fed. Reg. 41,694, 41,696.

75.     To make a determination that portions of the brook floater mussel's range are a "significant portion of [its] range," the Service looks for concentrated threats in any portion of the mussel's range and, for such threats, then determines if that portion of the range is "significant." The Service states that to determine whether a portion of a range fits within a reasonable definition

of "significant," the Service "look[s] for any portions that may be biologically important in terms of the resiliency, redundancy, or representation of the species." SAF at 25.

76.    The Service finds only one such threat for the brook floater mussel—energy production—which affects the mid-Atlantic portion of the range, which "contains 116 of the total 239 extant populations (forty-nine percent) of the species." *Id.* at 26.

77.    The Service then concludes that this portion of the range is insignificant because only a small minority of the mid-Atlantic populations are in "high" or "medium" condition, and even those populations are expected to deteriorate.

78.    The Service thus deems this portion of the range "is not contributing either currently or in the foreseeable future to the species' total resiliency at a biologically meaningful scale." *Id.*

79.    It concludes that "[e]ven if the mid-Atlantic representative area were to become extirpated, the species would maintain sufficient levels of resiliency, representation, and redundancy in the three other representative areas across its range, supporting the viability of the species as a whole." *Id.*

80.    But by considering a portion of Mussel's range "significant" only if, without that portion, the species warrants listing, the Service restates a policy that courts have vacated. Such an approach renders the phrase "significant portion" superfluous and conflicts with the statute's legislative history. *See Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001); *Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011, 1072–73 (N.D. Cal. 2018); *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 955 (D. Ariz. 2017), amended in part, No. CV-14-02506-TUC-RM, 2017 WL 8788052 (D. Ariz. Oct. 25, 2017) (limiting the vacatur to Arizona). In other words, the Service's SPR approach ensures that no species that is endangered or threatened in a significant portion of its range (but less than its entire range) could ever actually

be listed as such. Under the Service's approach, the more imperiled the population is in a portion, the less the Service will consider the portion to be "contributing either currently or in the foreseeable future to the species' total resiliency at a biologically meaningful scale[,]" SAF at 26, and thus the less the Service will consider it significant.

81.    Thus, by asking if the brook floater mussel as a whole would remain viable if the mid-Atlantic portion were extirpated, the Service is deeming the mid-Atlantic population insignificant based on an illegal definition of "significant portion of range." The Service fails to offer a reason why the mid-Atlantic portion of the mussel's range would be insignificant besides the fact that the entire species would not go extinct *throughout* its entire range without this portion.

82.    Next, the Service's consideration of concentrated threats during its "significant portion" of the brook floater mussel's range was unlawful in two ways.

83.    First, the Service evaluated whether the brook floater mussel is threatened or endangered in a significant portion of its range by considering only threats that are geographically concentrated in certain portions of its range. The Service "considered whether the threats are geographically concentrated in any portion of the species' range at a biologically meaningful scale. If the threats to the species are essentially uniform throughout its range, then the species would not have a greater level of imperilment in any portion of its range than it does throughout all of its range and no portion would constitute a significant portion of the range." SAF at 25.

84.    However, widespread threats that occur similarly across the range may affect the species in some portions of the range more than others because of small population size, population isolation, or other intrinsic factors that the Service did not consider as part of its analysis.

85.    This differential impact means that nonconcentrated threats may nevertheless endanger the species in a significant portion of its range.

86.    Second, using a flawed concentrated threat methodology, the Service stated it did not find any concentrated threats facing the brook floater mussel other than energy production. Nonconcentrated threats may nonetheless affect a geographically "concentrated" area of the brook floater mussel's habitat. Although these threats occur throughout the brook floater mussel's range, loss and modification owing to those threats may not occur uniformly, resulting in disproportionate effects on particularly isolated or vulnerable subpopulations. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 246 F. Supp. 3d 1272, 1286 (N.D. Cal. 2017) (directing the Service to reconsider its SPR analysis after finding that the Service "failed to recognize the California population's isolation and small and declining numbers," and thus "could not have properly assessed whether that sub-population was . . . 'especially vulnerable to extirpation.'"). For instance, the Service noted that Maine was especially vulnerable to the consequences of climate change, and yet did not treat certain consequences of climate change as a concentrated threat.

## FIRST CLAIM FOR RELIEF

### Violation of the ESA and the APA

#### *The Service Unlawfully Determined that Listing of the Brook Floater Mussel as an Endangered or Threatened Species Is Not Warranted*

87.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

88.    The ESA requires the Service to "determine whether any species is an endangered species or a threatened species" because of any one or a combination of five listing factors. 16 U.S.C. § 1533(a)(1). When doing so, the Service must rely "solely on the basis of the best scientific and commercial data available . . . ." *Id.* § 1533(b)(1)(A).

89.    Under the APA, 5 U.S.C. §§ 551 *et seq.*, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

90.     An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

91.     The Service's "not warranted" finding and associated SAF relies on unsupported conclusions that the various threats to the brook floater mussel detailed in the SSA, and affirmed by the best available scientific information, are not likely to affect the species' future viability.

92.     For example, the Service treated populations of brook floater mussels inconsistently when performing the Current Condition analysis as part of reaching its "not warranted finding."

93.     In the Current Condition analysis, the Service assigned discrete groups of brook floater mussel populations, termed "analysis units" ("AUs"), to one of five condition categories: "high," "medium," "low," "very low," or "unknown."

94.     "High" conditions occur where there is relatively good habitat and water quality. By implication, "low" conditions exist where habitat and water quality are less able to support viable populations.

95.     The "unknown" label reflects that the Service lacks recent data about brook floater mussel conditions for the AU. Specifically, "unknown" means that while a survey prior to 1997 identified a brook floater mussel occurrence in that AU, no subsequent surveys have been conducted in that area in the past twenty years to confirm continued presence of the mussel. Out

of the 239 total brook floater mussel AUs, the Service designated 59 AUs (approximately 25%) as "unknown."

96.    The Service included "unknown" populations in its analysis in the SSA but excluded those same populations in the SAF.

97.    This incongruent treatment of "unknown" populations led the Service to conclude in the SAF that only 47% of brook floater analysis units are in "low" or "very low" condition, whereas the SSA had previously indicated roughly 65% are in "low" or "very low" condition. By ignoring the estimates provided for unknown AUs in the SSA, the Service's SAF made the brook floater appear less imperiled than the Service's own estimates in the SSA would suggest.

98.    In addition, the Service ignored climate change as a primary stressor affecting the species' viability as part of reaching its "not warranted" finding.

99.    In its SSA, the Service extensively discussed the substantial effects of climate change in much of the brook floater mussel's current habitat, indicating that climate change is a "primary source" of stressors affecting the species' viability. SSA at 54, 70-75. The Service cited a multitude of scientific studies showing that climate change would negatively affect the brook floater mussel's habitats. Later in the SSA, the Service misleadingly asserted that the effects of climate change on water temperature will be mitigated by ground water input by referencing a study that concluded just the opposite: namely that climate change will in fact *undermine* the mitigating effects of groundwater. Martin A. Briggs et al., *Shallow bedrock limits groundwater seepage-based headwater climate refugia*, 68 Limnologica 142, 151 (2018).

100.    The Service's subsequent discussion of climate change in the SAF ignored the threats described in detail in the SSA and impermissibly relied on scientific uncertainty as a justification for ignoring the effects of climate change as a primary stressor.

**101.**    Thus, in the SAF, the Service ignored the best available science as presented in the SSA and otherwise known to the Service in order to reach its "not warranted" finding.

### SECOND CLAIM FOR RELIEF

### Violation of the ESA and the APA

***The Service's Significant Portion of Range Analysis is Arbitrary and Capricious***

102.    A species is "endangered" if it is "in danger of extinction" in "a significant portion of its range," and it is "threatened" if it "is likely to become an endangered species within the foreseeable future" in "a significant portion of its range." 16 U.S.C. § 1532(6), (20).

103.    The Service stated that a portion of a population meets its Significant Portion of the Range (SPR) standard when "(1) the portion is significant and (2) the species is in danger of extinction or likely to become so in the foreseeable future in that portion." SAF at 24.

104.    The Service screened for portions of the brook floater mussel's range that may be significant by looking for any portions that (1) may be "biologically important" with regard to "resiliency, redundancy, or representation of the species," and (2) may be in danger of extinction, or likely to become so in the foreseeable future, by asking whether the portion faced concentrated threats at a "biologically meaningful scale." *Id.* at 25.

105.    After finding that the mid-Atlantic portion faced concentrated threats and, therefore, may be considered a significant portion of the range, the Service examined whether the mid-Atlantic portion could, in fact, be considered significant by examining its "contribution to resiliency, redundancy, and representation of the species." *Id.* at 26.

106.    The Service determined that the mid-Atlantic portion was not significant because it did not contribute to the species' total resiliency "at a biologically meaningful scale compared to other representative areas." *Id.*

107.    The Service's consideration of threats in a "significant portion of [the brook floater mussel's] range" is unlawful in at least four ways.

108.    First, the Service's decision to determine significance using undefined notions of "biological importance" and "biological meaningfulness" is unlawful because it fails to provide a measuring stick for the significance determination and does not allow a reviewing court to judge whether the Service has properly exercised its discretion in implementing the ESA.

109.    Second, the Service's definition of "significant" is unlawful because it renders "significant portion of the range" superfluous and relies on an approach that courts have vacated. *See, e.g.*, *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001); *Defenders of Wildlife v. U.S. Fish & Wildlife Service*, 584 F. Supp. 3d 812, 828 (N.D. Cal. 2022); *Ctr. for Biological Diversity* v. *Jewell*, 248 F. Supp. 3d 946, 959 (D. Ariz. 2017), *amended in part*, No. CV-14-02506-TUC-RM, 2017 WL 8788052 (D. Ariz. Oct. 25, 2017).

110.    By stating that the mid-Atlantic portion could not be significant because the brook floater mussel species as a whole would remain viable even if the mid-Atlantic portion was extirpated, the Service ignored the ESA's distinction between a species that is threatened or endangered in a significant portion of its range and a species that is threatened or endangered throughout its entire range, rendering the SPR language in the ESA entirely superfluous.

111.    Furthermore, the Service's SPR approach ensures that no species that is endangered or threatened in a significant portion of its range (but less than its entire range) could ever be listed as such. Under the Service's approach, the more imperiled the population in a portion is, the less that portion will be considered to be "contributing . . . to the species' total resilience at a biologically meaningful scale[,]" SAF at 26, and thus, the less the Service will consider it significant. It is only when a species is abundant and reproducing in a portion of its range that,

under the Service's approach, the portion could be significant—but such a portion would fail the second prong of the SPR test because the population in that portion would not be threatened or endangered. The end result of the Service's logic is that no species that is actually endangered or threatened in only a portion of its range could ever be listed as such, rendering the ESA's "significant portion of its range" language superfluous.

112.    Third, the Service arbitrarily and capriciously limited its SPR analysis to threats that are geographically concentrated, stating: "If the threats to the species are essentially uniform throughout its range, then the species would not have a greater level of imperilment in any portion of its range than it does throughout all of its range and no portion would constitute a significant portion of its range." *Id.* at 25.

113.    The Service's decision to limit its analysis to geographically concentrated threats ignored the fact that even when a given threat is uniform throughout a species' range, the threat can endanger the species differently in different portions of its range because of small population sizes, isolation of individuals, and isolated populations. These are the realities of brook floater mussels' existence, which is why the Service erred when it failed to list the brook floater mussel as endangered.

114.    Fourth, the Service also erred in finding that the only concentrated threat faced by the brook floater mussel was development in the mid-Atlantic from oil and gas extraction.

115.    Such a conclusion disregards the best available science and the Service's findings in the SSA. Contrary to the Service's assertion in the SAF, the brook floater mussel faces concentrated threats from climate change, agricultural runoff, pollution, hybridization, and isolation.

116.    Overall, the Service's finding that the brook floater mussel is not threatened or endangered in a significant portion of its range misapplies the ESA's text and the best available science, making it unlawful, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

### Violation of the ESA and the APA

### *The Service's Foreseeable Future Analysis is Arbitrary and Capricious*

117.    The ESA requires that the Service list a species as "threatened" if it is "likely to become an endangered species *within the foreseeable future* throughout all or a significant portion of its range." 16 U.S.C. § 1532(20) (emphasis added).

118.    The Service selected a thirty-year timeframe for its foreseeable future analysis, stating that it "could not look beyond 30 years in the future to assess impacts of the primary stressors to the brook floater." SAF at 23.

119.    While the ESA does not require the Service to use a particular timeframe, the reasoning for the chosen timeframe must be "justifiable and clearly articulated." *In re Polar Bear 4(d) Rule Litigation*, 709 F.3d 1, 16 (D.C. Cir. 2013).

120.    The Service failed to adequately explain and justify its decision to confine its outlook to thirty years in light of the ESA's mandate that the Service make its determination "solely on the basis of the best scientific and commercial data available . . . ." 16 U.S.C § 1533(b)(1)(A).

121.    For example, in multiple instances, members of the Service's Brook Floater Listing Recommendation Team suggested the feasibility and desirability of a longer foreseeable future timeline of up to fifty years.

122.    Indeed, the Field Supervisor of the Service's New York Field Office, David Stilwell, stated, "I personally am comfortable looking out to 50 years based on my own observation of change during my 30-year career with the agency."

123.    Stilwell further stated that a fifty-year outlook might have resulted in assigning a higher probability of extinction due to the brook floater mussel's small population sizes and the possibility that AUs currently in "low" or "very low" condition may be extirpated or functionally extirpated by year thirty.

124.    In light of this statement and other evidence on which the agency made its determination, the Service's decision that it could not look further out than 30 years is neither justifiable nor clearly articulated. Similarly, the Service's determination fails to rely on the best available evidence in contradiction of expert opinion that a longer timeframe would have been both possible and justified.

## FOURTH CLAIM FOR RELIEF

### Violation of the ESA and the APA

*The Service's Evaluation of the Adequacy of Existing Regulatory Mechanisms is Arbitrary and Capricious*

125.    Under the ESA, the Service must evaluate whether a species warrants listing due to the "inadequacy of existing regulatory mechanisms." *Id.* § 1533(a)(1)(D).

126.    In the SSA, the Service concluded that existing regulatory measures were *not* adequate to protect the brook floater mussel, stating: "There are limited conservation programs that are specifically targeted at the brook floater mussel or significantly reducing any of the primary stressors," and "measures *will need to be* imposed to ensure good water quality, sufficient flows, temperatures, and substrate for brook floater mussels to persist into the future." SSA at 67 (emphasis added).

127.    The SSA also notes that one existing regulatory mechanism, the Clean Water Act, is not currently adequate to counteract water pollution, one of the primary threats to the brook floater mussel's viability: "Despite existing authorities, such as the Clean Water Act, pollutants continue to impair the water quality throughout the current range of the brook floater. [. . .] While new water quality criteria are being developed that take into account more sensitive aquatic species, most criteria currently do not." *Id.* at 65.

128.    The SAF, however, is entirely silent on the issues surrounding existing regulatory mechanisms raised in the SSA. The SAF makes a single conclusory statement that existing regulatory mechanisms were "evaluated . . . in the context of the relevant threats." SAF at 21. In light of the Service's "not warranted" finding, such a statement amounts to a tacit determination that existing regulatory mechanisms are adequate to ensure the brook floater mussel's continued survival. Otherwise, the Service must explain why a "not warranted" listing decision was justified despite findings in the SSA that existing regulatory mechanisms are inadequate.

129.    Because the Service failed to address the SSA's findings that existing regulatory mechanisms were inadequate, failed to provide independent findings on the adequacy of existing regulatory mechanisms in its listing decision, and concluded that a "not warranted" listing decision was justified without even addressing the regulatory mechanisms prong of the ESA beyond a perfunctory statement that "regulatory mechanisms were evaluated . . . in the context of the relevant threats," the Service's actions were unlawful, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

130.    Declare that the Service acted arbitrarily and capriciously and violated the ESA in issuing its August 15, 2019, "not warranted" finding for the brook floater mussel;

131.    Vacate and remand the "not warranted" finding to Defendants and order the Service to issue a listing determination by a date certain that is consistent with the ESA, the APA, and this Court's Order;

132.    Award Plaintiff its attorneys' fees and costs pursuant to 16 U.S.C. § 1540(g)(4); and

133.    Grant Plaintiff such further and additional relief as the Court may deem just and proper.

DATE: April 17, 2025

Respectfully submitted,

/s/ Mark Norman Templeton
Mark Norman Templeton (D.D.C. Bar No. IL0114)
Abrams Environmental Law Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611
templeton@uchicago.edu

/s/ John T. Buse
John T. Buse (D.D.C. Bar No. CA00169)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(323) 533-4416
jbuse@biologicaldiversity.org

*Attorneys for Plaintiff*